**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X

NOEMIE DODAKIAN,

                              Petitioner,

            -against-

UNITED STATES OF AMERICA,

                              Respondent.

-------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__   8/14/2015
```

**14-CV-01188 (AJN)(SN)**

**REPORT AND**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE ALISON J. NATHAN:**

  The petitioner Noemie Dodakian was convicted of two counts of conspiracy to commit

wire fraud, in violation of 18 U.S.C. § 1349, and sentenced to 95 months' imprisonment. The

Court of Appeals for the Second Circuit affirmed the judgment. Before the Court is Dodakian's

*pro se* petition for a writ of *habeas corpus*, pursuant to 28 U.S.C. § 2255, to vacate, set aside, or

correct her sentence. She alleges that: (1) evidence introduced at trial derived from an

unreasonable search and seizure, in violation of the Fourth Amendment; (2) her sentence

reflected gender discrimination, in violation of the Fourteenth Amendment's Equal Protection

Clause; (3) she was denied effective assistance of counsel at the pre-trial and trial stages of the

proceedings, in violation of the Fifth and Sixth Amendments; (4) she was denied effective

assistance of counsel at sentencing, in violation of the Fifth and Sixth Amendments; (5) she was

denied effective assistance of counsel on appeal, in violation of the Fifth and Sixth Amendments;

and (6) the government engaged in prosecutorial misconduct before and at trial, in violation of

Brady v. Maryland, 373 U.S. 83, 87 (1963). For the reasons that follow, I recommend that Dodakian's petition and request for a hearing be DENIED.

## BACKGROUND

Dodakian's *habeas* petition arises from her role as a "facilitator" in two, interrelated conspiracies to commit advance fee schemes. In both, victims were induced to invest money with promises of large payouts in a short period of time, but in the end, received neither their principal nor any payout.

### I.      Pre-Trial

On May 29, 2008, the Honorable Michael H. Dolinger signed a search warrant, authorizing law enforcement personnel and authorized agents to search the email account prosper40@comcast.net, belonging to Dodakian and controlled by Comcast, Inc. The warrant also directed Comcast personnel to produce "[a]ll stored electronic mail and other stored content information contained in, or on behalf of, [the email address] as of the time of the preservation request issued on or about February 20, 2008" and "all transactional information of all activity" of the email address. Pet'r Am. Br. Ex. A. The warrant did not, however, identify the crime or criminal activity for which probable case was being established.

In August 2008, Dodakian was arrested and charged in a two-count Indictment. Count One charged Dodakian and co-defendants David "Jim" Norman and Olivia Jeanne Bowen with taking part in an advance fee scheme (the "Norman scheme") through which the co-defendants offered individuals an opportunity to reap benefits from an allegedly profitable investment account held by the World Bank in a foreign country. Count Two charged Dodakian and co-defendants Bowen, Robert Ingram, and Chong Shin Wu with taking part in an advance fee

scheme (the "Ingram scheme") through which they offered individuals an opportunity to invest in allegedly profitable notes issued by the Federal Reserve.

On December 17, 2009, Dodakian filed, through her attorney Roger Lee Stavis and his associates, (1) a motion to suppress evidence obtained through searches of her residence, (2) a motion to suppress evidence seized pursuant to an e-mail search warrant because the warrant did not limit the search to only those emails having a nexus to the charged crime, and (3) a motion to sever counts.

The Honorable Leonard B. Sand denied these motions in a published opinion. United States v. Bowen, 689 F. Supp. 2d 675 (2010). First, Judge Sand found "ample evidence of probable cause to search Dodakian's residence" based on an affidavit of Special Agent Zacher. Id. at 679. Second, Judge Sand found the email search warrant was not overbroad and did not lack particularity: the Fourth Amendment did not require that the warrant specify particular search methods or that the Internet service provider be delegated with ascertaining which emails were relevant before disclosing them. Because there was "clearly probable cause to find that criminal activity permeate[d] much of the business conducted by Defendants through the target e-mail accounts," the warrant also fell under the "all records exception."[1] Id. at 683-84 (internal quotations omitted). Further, even if the warrant had been overbroad or lacked particularity, it was saved by the "good faith" exception: the warrant was not so "facially deficient" and "an executing agent would reasonably expect to seize a broad swath of e-mails" because the warrant involved a complex, multi-year fraud case. Id. at 684. See United States v. Leon, 468 U.S. 897

---

[1] The "all records exception" "principle is not so much an 'exception' to the particularity requirement of the Fourth Amendment as a recognition that a warrant – no matter how broad – is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based. The more extensive the probable wrongdoing, the greater the permissible breadth of the warrant." Bowen, 689 F. Supp. 2d at 683 n.6 (quoting United States v. Hickey, 16 F. Supp. 2d 223, 240 (E.D.N.Y. 1998), motion for reconsideration granted on other grounds, 16 F. Supp. 2d 223).

(1984). Third, Judge Sand held that joinder was proper under Rule 8(b) because "[t]he two schemes had overlapping participants and victims," "movement of victims across the schemes," and the co-defendants had "knowledge of the existence and nature of the other scheme." Id. at 685. He declined to sever under Rule 14 because he could not "discern any prejudice to Defendants, beyond the usual prejudice anticipated by Rule 8." Id. at 686.

In April 2010, Dodakian's co-defendants Bowen and Ingram pleaded guilty. On September 28, 2010, three weeks before the start of Dodakian's and Wu's joint trial, Bowen was sentenced to 63 months' imprisonment to run concurrently on each of Counts One and Two, followed by three years of supervised release, and Ingram was sentenced to 144 months' imprisonment on Count Two, followed by three years of supervised release. Judge Sand found Bowen and Ingram joint and severally liable for restitution in the amount of $6,791,412.

## II.    Trial

On October 18-21 and 25-28, and November 1, 2010, Dodakian and co-defendant Wu proceeded to trial by jury. After the government rested its case, Dodakian's counsel moved for dismissal pursuant to Rule 29 on the grounds that the government failed to introduce sufficient evidence to establish venue. Judge Sand denied the motion. On November 1, 2010, the jury returned a guilty verdict against Dodakian on both counts, and a guilty verdict against Wu on Count Two, the sole count in which he was charged.

Evidence at trial demonstrated that the Ingram scheme involved an allegedly high-yield investment program, in which Dodakian liaised with victims and recruited them to invest money in a purported $23 billion certificate of time deposit, for which Wu allegedly was the "proponent-beneficiary." Tr. 64:7-8.[2] The co-defendants told investors that they would receive

---

[2] "Tr." refers to the transcript of Dodakian and Wu's trial, dated October 18-21 and 25-28 and November 1, 2010. "S. Tr." refers to the transcript of Dodakian's sentencing hearing, dated March 16, 2011.

large returns on their investments, in a short period of time, and the investments were contributing to humanitarian projects. The Norman scheme involved an investment portfolio in Spain, and Dodakian again served as a facilitator, recruiting and liasing with investors and promising exorbitant returns.

      **1.**      **The Victims**

At trial, victims described Dodakian as appearing "absolutely" knowledgeable about the programs she was offering (Tr. 432:21-24), and as having "expertise" as though "she had been doing this for a long time." Tr. 206:18-20, 297:5-8, 352:23-25. During phone calls with victims, she pitched and vouched for investment opportunities, assured listeners that their principal was secure, and told them that she would not get paid until they, the investors, were paid. See, e.g., Gov't Br. Ex A (Transcript of September 20, 2015 Dodakian Conference Call with Potential Investors) at 5:38-39 ("[W]e get paid when you get paid. We don't get one penny before that.").

One victim testified that that she initially received an email solicitation from the "LiveDebtFree" best5solutions@hotmail.com email account, in which Dodakian advertised an investment that "will pay out in 30-60 days," "pays 15x the amount contributed," has "principal [that] is guaranteed," and "is conducted within the highest security clearance of the Federal Reserve." Tr. 571-77; Gov't Br. Ex. B. Dodakian then increased the offer to 7,000-percent return within the same 30 to 60 days. The victim eventually invested $28,000, and when Dodakian indicated additional funds were needed urgently, $5,000 more – the victim's life savings. Ultimately, $2,500 was returned to her, but not the rest of her principal or any promised returns.

Another victim testified that she invested $110,000, secured by a line of credit on her home as a result of Dodakian's recommendations and assurances that the funds supported religious ministry programs. That victim never received her principal or any payouts, and she

was forced to sell her house. A third victim invested $410,000, and later, when he received

neither that principal nor the promised returns, he entered bankruptcy proceedings, and his house

was foreclosed. Yet another victim testified that Dodakian promised up to 10 times, and then 20

times, return on principal. Dodakian sent that victim "a letter of guarantee that she personally

would pay back within 30 days if the investment didn't come through within the timeframe she

had projected." Tr. 420:8-10.

Dodakian's daughter, Lisa Dodakian, as well as Dodakian's husband, Aram Dodakian,

testified on Dodakian's behalf. Lisa testified in part that she gave her mother some of her own

money to invest, for which her mother had promised a 200-percent return, but she never received

the promised returns.

### 2.    The Proceeds

During the years of the Ingram and Norman schemes, 2005 to 2006, Dodakian had 13

bank accounts, for which she "was either named as an account holder" or which belonged to

businesses for which Dodakian was "a signatory or controlled the business." Tr. 497:4-7.

Dodakian admits that, for a period of time, the victims' funds were comingled in these accounts

with her families' own funds.

The government's forensic accountant, Angela Clancy, testified that these accounts

received $2.7 million from named individuals and an additional $1.9 million from people or

sources whose names were not specifically listed. From 2003 to 2008, $604,000 was withdrawn

from these accounts via cash withdrawals or checks written to cash; and in 2006 alone, $300,000

was withdrawn, mostly through checks made out to "self." Tr. 770:8-771:12. For instance,

between January 2006 and May 2006, bank records show: $8,500 paid to "self cash" (March 29,

2006), $10,000 paid to cash (March 30, 2006), and $7,500 paid to "cash-self" (April 5, 2006).

Ms. Clancy also identified $532,000 worth of purchases made from those accounts, including payments made to Dodakian's children's colleges, $93,000 in mortgage payments, $49,000 in automobile expenses, and $31,000 in travel expenditures. Dodakian paid $104,338 to her husband, via several checks, and money also was paid to her co-defendants. Of the $2.7 million received from named individuals, only $137,000 was ever returned to investors.

Trial testimony also revealed that Dodakian and her husband did not file a timely 2004 tax return, and after being audited by the IRS, eventually file her 2004 tax return in 2006 and listed Noemie Dodakian's profession as "consultant." Tr. 1043:16-145:12. Although Mr. Dodakian testified that he made approximately $150,000 a year, he reported only $44,866 in business income in that 2004 return. The Dodakians also did not file tax returns for 2005 through 2009, which includes the years the schemes were in operation, until two months before trial. The Dodakians' reported income in 2006, 2007, and 2008 was, respectively, $98,750, $78,464, and $37,908. In the 2005-2009 returns, Dodakian listed her occupation as "housewife." Tr. 944:5-6.

### 3.    The Defendant

Dodakian testified in her own defense, alleging that she participated in the schemes with the good faith belief that the schemes were real. She described herself as not a "financial person" (Tr. 994:3), and likened her role in the schemes as "really bookkeeping [], keeping track of information . . . secretarial work." Tr. 970:3-5.

On cross-examination, the government challenged Dodakian's assertions that she was not a "financial person." Dodakian confirmed that she maintained three limited liability companies ("LLCs"), whose purpose was to receive and move money, and maintained at least 12 bank accounts for herself and her LLCs. Dodakian acknowledged that she had previously sold financial products, and in a 2007 job application, she described herself as having three years of

experience with a financial services company and having worked for 11 years as a self-employed entrepreneur in financial and health service opportunities. On a more recent job application to work in the mortgage business, Dodakian described herself as "self-employed," in contrast to her self-reported occupation of "housewife" on her tax returns. Tr. 1028:19-21, 1031:25-1034:17.

The government also questioned Dodakian about having passed two examinations offered by the National Association of Securities Dealers ("NASD"), a self-regulatory organization that regulated securities industries professionals and administered licensing examinations.[3] One of the exams, the Series 6 exam, allowed her to become licensed to sell financial products, including mutual funds. The government asked Dodakian whether she had taken an exam to become a supervisor of people who sell mutual funds, but she denied that she had, and the government eventually dropped the line of questioning.[4] Mr. Stavis objected to the introduction of the NASD applications into evidence pursuant to Federal Rules of Evidence Rule 608(b).[5] The district court overruled the objection. See Gov't Br. Ex. D.

The jury returned a verdict of guilty on all counts.

---

[3] Because of a merger with the member regulation, enforcement and arbitration operations of the New York Stock Exchange, the NASD no longer exists. The Financial Industry Regulatory Authority ("FINRA"), however, continues to administer the NASD licensing examinations. See *NASD and NYSE Member Regulation Combine to Form the Financial Industry Regulatory Authority – FINRA* (July 30, 2007), https://www.finra.org/newsroom/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry-regulatory-authority (last visited July 2, 2015).

[4] The Series 6 exam is the Investment Company and Variable Contracts Products Representative Examination. See *FINRA Qualification Exams*, http://www.finra.org/industry/qualification-exams (last visited June 23, 2015). Dodakian also took and passed the Series 63 Uniform Securities State Law Examination. Id.; Pet'r Reply Br. at 14. She took the supervisory Series 26 Investment Company and Variable Contracts Products Principal Examination twice but failed it both times. Id.

[5] Rule 608(b) states that, "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence "is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608(b).

### III.    Sentencing

On March 16, 2011, Judge Sand held a sentencing hearing. The Probation Office's Presentence Report calculated Dodakian's prison guidelines range as 87 to 108 months and recommended 87 months' imprisonment. In the defense's Sentencing Memorandum, and at the hearing, Mr. Stavis requested a below-guidelines sentence that would be "'sufficient but not greater than necessary' to fulfill the sentencing objective of Congress," pursuant to the sentencing factors laid out by 18 U.S.C. § 3553. See Sentencing Memorandum at 3 (07 Cr. 961-1, ECF No. 153); S. Tr. 4:24-25. Mr. Stavis acknowledged that "[u]nder the Section 3553 factors," the court must consider "punishment," "deterrence," and "the nature and circumstances of the offense," but noted that the court also must consider "the history and characteristics of the offender." S. Tr. 4:10-15. Several affidavits attached to the Sentencing Memorandum, as well as letters from Dodakian's son and daughter, addressed Dodakian's commitment to her "family, church and community." Sentencing Memorandum at 3-11; S. Tr. 4:4-7. Mr. Stavis emphasized Dodakian's role as a "devoted [] wife, mother, sister, friend"; her participation in "PTA meeting[s]," "Cub Scout meeting[s]," "violin lesson[s]," and "other community activities"; and her membership in the First Assembly of God Church. S. Tr. 3:19-21, 5:24-5:2. Although there had been commingling of funds, Mr. Stavis stressed that there was no proof that Dodakian had spent money on luxury goods or a high lifestyle, and no cash was recovered from her home. He submitted that Dodakian's co-defendant Bowen had been more culpable, and as a result, Dodakian should get less than Bowen's 63 months' imprisonment. Dodakian also was "making the most [] of her" time in prison and helping her fellow inmates. S. Tr. 6:22-23.

The government acknowledged that "[t]here is no dispute that the good Dodakian has done in her life merits consideration by the court." S. Tr. 3:16-17, 14:24-25. Nor did the

government dispute that Dodakian "sent substantial amounts of money along to her co-conspirators." S. Tr. 11:14-15. Nonetheless, the government emphasized that she perpetrated "a devastating fraud that affected a huge number of people," benefited financially from the fraud, and demonstrated "a complete lack of remorse . . . appreciat[ion] or regret[ with regards to] the scope of her fraud and the devastation that it has caused to innocent people." S. Tr. 11:1-19, 14:25-3, 15:5-9. As a result, the government sought a two-level obstruction of justice enhancement, founded on Dodakian's allegedly perjurious trial testimony. Mr. Stavis argued against the enhancement because the government lacked "a specific objective statement" in which Dodakian perjured herself. S. Tr. 14:16-17.

Judge Sand agreed with Mr. Stavis: the government had not identified "the specific objective statement" that had been disproven or on which she perjured herself. S. Tr. 14:15-18. Judge Sand discussed "the number of victims [and] the number of people who have lost their homes, have lost a considerable amount of money so that some people are now in poverty because they believed in what they were told by Ms. Dodakian." S. Tr. 4:16-20. He spoke directly to Dodakian, stating, "[Y]ou have wrecked the lives of many victims. You have been hypocritical in what you have done. The crime here is of vast magnitude because you preyed on naïve, unsophisticated victims . . . . You lied to them over and over again." S. Tr. 16:3-8. He sentenced her to 95 months' imprisonment, followed by three years' supervised release. She was found jointly and severally liable for restitution in the amount of $6,893,862, and ordered to pay $12 million in forfeiture. See June 16, 2011 Order (07 Cr. 961-2, ECF No. 162-63).

On May 18, 2011, two months after Dodakian was sentenced, Judge Sand sentenced Wu to 85 months' imprisonment, followed by three years' supervised release. He was found jointly and severally liable $6,893,862 in restitution, and ordered to pay $7 million in forfeiture.

**IV.     Appeal**

Dodakian timely appealed her conviction. On appeal, she argued, through her attorney Mr. Stavis, that: (1) the district court erred in denying her motion to suppress emails seized pursuant to an overbroad search warrant, in violation of the Fourth Amendment; (2) the government's use of her NASD license application for impeachment purposes violated Federal Rule of Evidence 608(b); and (3) the district court erred in giving a "no ultimate harm" instruction. See United States v. Ingram, 490 F. App'x 363, 365-67 (2d Cir. 2012).

The Court of Appeals for the Second Circuit consolidated her appeal with those of Wu and Ingram, and affirmed their convictions in a summary order. Id. First, the Court of Appeals found the "good faith" exception to the exclusionary rule applied, without reaching the issue of whether the email search warrant complied with the particularity requirement. Id. Second, the Court of Appeals found that Rule 608(b) was inapplicable: the NASD license "was admitted to impeach Dodakian *by contradiction*, whereas Rule 608(b) addresses extrinsic evidence admitted to impeach by demonstrating *character for untruthfulness*." Id. at 366. See n.5. Third, the Court of Appeals noted that Dodakian's objection to the "no ultimate harm" instruction was preserved, and found that the instruction had a proper predicate: "[t]he instruction was [] appropriate to ensure that jurors would not acquit if they found that Dodakian had intended to deceive investors, but credited her testimony that she believed the funds would ultimately pay out." Ingram, 490 F. App'x at 367. Lastly, with regards to Dodakian, the Court of Appeals found that the evidence demonstrated "that Dodakian deliberately lied about, *inter alia*, the security of the investments and the timing of the payments to induce investors to part with their money." Id. at 367.

## V.      The Co-Defendants' Other Proceedings

In January 2013, Norman proceeded to trial, after which the jury found him guilty of Count One, the sole count in which he was charged. On July 15, 2013, the Honorable Katherine B. Forrest sentenced him to 240 months' imprisonment, followed by three years' supervised release, $1,731,805.34 in restitution, and $2,197,637.04 in forfeiture. On appeal, the Court of Appeals for the Second Circuit affirmed the decision. See United States v. Norman, 776 F.3d 67 (2d Cir. 2015).

On May 20, 2014, the Honorable Katherine B. Forrest denied Wu's *habeas* petition. Wu v. United States, 13 Civ. 8358 (KBF), 07 Cr. 961-3, 2014 WL 2112128 (S.D.N.Y. May 20, 2014). On December 23, 2014, the Honorable Kevin Nathaniel Fox recommended that Ingram's *habeas* petition be denied. Ingram v. United States, 13 Civ. 6613 (PGG)(KNF), 07 Cr. 961-5, 2014 WL 7330438 (S.D.N.Y. Dec. 23, 2014).

## VI.     *Habeas* Petition

On February 18, 2014, the *Pro Se* Office for the Southern District of New York received Dodakian's *habeas* petition. On March 11, 2014, the Court ordered Dodakian to show cause why her motion should not be time-barred under the one year statute of limitations imposed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2255. On April 7, 2014, Dodakian submitted an affirmation, and on May 22, 2014, the Court issued an order, finding that Dodakian's motion should not be summarily dismissed.

On December 22, 2014, Dodakian filed an amended petition. On January 16, 2015, Dodakian filed a letter seeking to correct clerical errors that she made with respect to grounds five and six in her petition, and on February 2, 2015, the Court granted her request, incorporating her letter and revised grounds five and six into her amended petition. The government opposed

the motion on February 14, 2015, and Dodakian filed her reply on April 20, 2015. The matter is fully submitted.

## DISCUSSION

### I.  Standard of Review

"The writ of *habeas corpus* stands as a safeguard against imprisonment of those held in violation of the law." Harrington v. Richter, 562 U.S. 86, 91 (2011). Under 28 U.S.C. § 2255, a petitioner may move the court which imposed her federal sentence to vacate, set aside, or correct her sentence where the sentence was imposed in violation of the Constitution or the laws of the United States, the sentencing court lacked jurisdiction, the sentence was in excess of the maximum authorized by law, or the sentence was an error of law or fact that "constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Cuoco v. United States, 208 F.3d 27, 30 (2d Cir. 2000) (internal quotations and citation omitted); 28 U.S.C. § 2255.

The Court's discretion to grant *habeas* relief is narrowly limited out of "respect for the finality of criminal sentences, the efficient allocation of judicial resources, and an aversion to retrying issues years after the underlying events took place." United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995). As a result, to upset a conviction by collateral attack, a petitioner "must clear a significantly higher hurdle than would exist on direct appeal." United States v. Frady, 456 U.S. 152, 166 (1982). See Yick Man Mui v. United States, 614 F.3d 50, 53 (2d Cir. 2010).

One hurdle is the one-year limitation on the period during which relief under § 2255 may be sought. See 28 U.S.C. § 2255(f). A second hurdle is that a petitioner may not employ a § 2255 petition to relitigate claims that were raised and already considered on direct appeal. See United States v. Sanin, 252 F.3d 79, 83 (2d Cir. 2001) (*per curiam*). A third hurdle is that if a petitioner

fails to assert a claim on direct review, she may not raise it in a § 2255 petition unless she can establish "cause" for the procedural default and "actual prejudice" resulting therefrom, or that she is "actually innocent" of the crime of which she was convicted. Bousley v. United States, 523 U.S. 614, 621-22 (1998) ("*Habeas* review is an extraordinary remedy and will not be allowed to do service for an appeal." (internal quotations and citation omitted)); United States v. Munoz, 143 F.3d 632, 637 (2d Cir. 1998) (same). This rule of procedural default, however, does not extend to ineffective assistance of counsel claims, which "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." Massaro v. United States, 538 U.S. 500, 504 (2003) (explaining that ineffective assistance claims are more appropriately raised in a *habeas* petition than on direct appeal). See also United States v. Gallo-Lopez, 931 F. Supp. 146, 148 (N.D.N.Y. 1996) ("One way for a 2255 petitioner to satisfy both the cause and prejudice requirements is to prove that he received ineffective assistance of counsel.").

Generally, *pro se* motions filed pursuant to § 2255 "are entitled to a liberal construction" and should be read "to raise the strongest arguments that they suggest." Green v. United States, 260 F.3d 78, 83 (2d Cir. 2001) (internal quotations and citation omitted).

## II.    Ground One: Email Search Warrant as Violation of the Fourth Amendment

Dodakian argues that the emails retrieved from her email account were seized pursuant to a defective warrant, prejudicing her at trial, in violation of the Fourth Amendment. In support of her claim, she argues that: (1) Fourth Amendment claims are cognizable on § 2255 review because the bar recognized in Stone v. Powell, 428 U.S. 465 (1976), does not extend beyond § 2254 review; (2) even if this argument was made and addressed on direct appeal, she may attack her conviction on this ground due to a change in intervening law, United States v. Galpin,

720 F.3d 436 (2d Cir. 2013), pursuant to <u>Davis v. United States</u>, 417 U.S. 333 (1974); and (3) in the event that the Court is precluded by § 2255 from reaching the merits of this claim, the Court should find § 2255 unconstitutional, or consider this a *habeas corpus* petition under 28 U.S.C. § 2241, or deem this claim a motion under Federal Rule of Civil Procedure 60(b).

> **1.      Cognizability of Fourth Amendment Claims in a § 2255 Motion Pursuant to <u>Stone v. Powell</u>**

Dodakian argues that the bar precluding Fourth Amendment claims on *habeas* review, established by the Supreme Court in <u>Stone v. Powell</u>, pertains only to state *habeas* petitions, pursuant to 28 U.S.C. § 2254, and not federal *habeas* motions, pursuant to 28 U.S.C. § 2255. The government argues that the <u>Stone</u> bar applies to § 2254 and § 2255 motions.

In <u>Stone v. Powell</u>, a case brought pursuant to 28 U.S.C. § 2254, the Supreme Court held that Fourth Amendment exclusionary rule claims are not cognizable in *habeas* proceedings where the state courts "provided an opportunity for full and fair litigation" of the claim. 428 U.S. at 482. The Supreme Court reasoned that because "[t]he primary justification for the exclusionary rule [] is the deterrence of police conduct that violates Fourth Amendment rights," <u>id.</u> at 486, its implementation at trial and "enforcement on direct appeal" "discourage law enforcement officials from violating the Fourth Amendment by removing the incentive to disregard it." <u>Id.</u> at 492-93. But "the additional contribution, if any, of the consideration of search-and-seizure claims of state prisoners on collateral review is small in relation to the costs." <u>Id.</u> at 493. Accordingly, when "weighing the utility of the exclusionary rule against the costs of extending it to collateral review of Fourth Amendment claims, <u>id.</u> at 489, the Court concluded that "the overall educative effect of the exclusionary rule" would not "be appreciably diminished if search-and-seizure claims could not be raised in federal *habeas corpus* review of state convictions." <u>Id.</u> at 493.

In so holding, Stone v. Powell did not address whether its holding applied to § 2255. Moreover, Stone did not expressly overrule Kaufman v. United States, which held "that a claim of unconstitutional search and seizure is cognizable in a § 2255 proceeding." 394 U.S. 217, 231 (1969). Rather, Stone rejected only "the *dictum* in Kaufman" concerning the applicability of the exclusionary rule under § 2254: "To the extent the application of the exclusionary rule in Kaufman did not rely upon the *supervisory role of this Court* over the lower federal courts, the rationale for its application in that context is also rejected." Stone, 428 U.S. at 496 n.16 (emphasis supplied) (internal citation omitted).

Following Stone, courts have differed on whether Stone's Fourth Amendment bar applies to § 2255 petitions, and the Court of Appeals for the Second Circuit has not weighed in on the matter. See Laaman v. United States, 973 F.2d 107, 114 (2d Cir. 1992) (finding that, in the context of an ineffective assistance of counsel claim founded on a Fourth Amendment violation, the petitioner's Fourth Amendment claim was not meritorious, so the court "need not and [did] not" reach the Stone issue of whether free-standing Fourth Amendment claims are cognizable under § 2255); Indiviglio v. United States, 612 F.2d 624, 631 n.15 (2d Cir. 1979) (same).

The Supreme Court has since, ambiguously, noted in a footnote that:

> After Stone, the only cases raising Fourth Amendment challenges on collateral attack are those federal habeas corpus cases in which the State has failed to provide a state prisoner with an opportunity for full and fair litigation of his claim, *analogous federal cases under 28 U.S.C. § 2255*, and collateral challenges by state prisoners to their state convictions under postconviction relief statutes that continue to recognize Fourth Amendment claims.

United States v. Johnson, 457 U.S. 537, 563 n.20 (1982) (emphasis supplied).

Scholars James Liebman and Randy Hertz have explained:

> Adherence to the principle that a section 2255 motion continues the original criminal proceedings would suggest that Stone should not

16

> apply to section 2255 motions. For, under the "continuation of proceedings" logic, section 2255 proceedings are analogous to the state criminal procedures for enforcing the 4th Amendment exclusionary rule whose existence and presumptive effectiveness led the Court in <u>Stone</u> to conclude that redundant, civil-collateral, proceedings on the matter were unnecessary.

James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure § 41.7(c) (6th ed. 2014). <u>See</u> Advisory Committee Note to Rule 1, Rules Governing § 2255 Proceedings (adopted 1976) (explaining that Section 2254 "*habeas corpus* is a separate civil action and not a further step in the criminal case . . . [such that] the court or judge is by no means in the same advantageous position in *habeas corpus* to do justice as would be so if the matter were determined in the criminal proceeding"; whereas "a motion under Section 2255 is a further step in the movant's criminal case rather than a separate civil action" (internal citations omitted)). And the Court of Appeals for the Eighth Circuit has held that <u>Stone</u> does not bar a Fourth Amendment claim on § 2255 review because "the supervisory power of federal appellate courts over district courts is broader than its authority to review state court decisions under § 2254." <u>Baranski v. United States</u>, 515 F.3d 857, 859-60 (8th Cir. 2008).

The majority of courts, however, have ignored "the 'continuation of proceedings' analysis for these purposes and rel[ied] instead on the assumption of commensurability between section 2255 and *habeas corpus* actions" to conclude that the <u>Stone</u> bar extends to § 2255 review. Federal Habeas Corpus Practice and Procedure § 41.7(c). <u>See, e.g.</u>, <u>Ray v. United States</u>, 721 F.3d 758, 761-62 (6th Cir. 2013) ("We see no reasoned basis to distinguish between § 2254 and § 2255 when applying the Supreme Court's holding in <u>Stone</u>."); <u>Brock v. United States</u>, 573 F.3d 497, 501 (7th Cir. 2009) (same); <u>United States v. Ishmael</u>, 343 F.3d 741, 742 (5th Cir. 2003) (same); <u>United States v. Clipper</u>, 313 F.3d 605, 608 (D.C. Cir. 2002) (same); <u>United States v. Cook</u>, 997 F.2d 1312, 1317 (10th Cir. 1993) (same); <u>United States v. Hearst</u>, 638 F.2d 1190,

1196 (9th Cir. 1981) (same). <u>See also</u> <u>Camacho v. United States</u>, 204 F. Supp. 2d 667, 670 n.*

(S.D.N.Y. 2002) (holding that where the petitioner "had an opportunity for full and fair litigation

of his Fourth Amendment claim" and "took advantage of it in an unsuccessful motion to

suppress," his claim was not cognizable on a § 2255 motion).

 I find that the policy reasons that support <u>Powell</u> apply equally in the § 2255 context.

Accordingly, the Court should deny Dodakian's Fourth Amendment claim as barred from *habeas*

review. But, even if such claim were permissive, the Court should deny this claim on the merits.

### 2. Cognizability of Fourth Amendment Claims Already Raised and Considered on Direct Appeal Pursuant to <u>Davis v. United States</u>

 Dodakian next argues that due to a change in intervening law, she may raise this Fourth

Amendment claim even though it was raised and addressed on direct appeal. <u>See</u> <u>Davis v. United</u>

<u>States</u>, 417 U.S. 333 (1974).

 In <u>Davis</u>, the Supreme Court created an exception to the general rule that a § 2255 motion

cannot be used to relitigate questions that were raised and considered on direct appeal. The

Supreme Court held that a petitioner may attack her conviction on the basis of an "intervening

change of law" that occurred between the direct appeal and collateral review *if* the intervening

law could have changed the result of the petitioner's direct appeal. <u>Id.</u> at 342, 346 (explaining

that the exception's absence would constitute a "fundamental defect which inherently results in a

complete miscarriage of justice" (quoting <u>Hill v. United States</u>, 368 U.S. 424, 428 (1962)).

 The government argues that for <u>Davis</u> to apply, there must an "intervening change of

law" *and* that the law render the charged conduct noncriminal. Gov't Br. at 19-20. Although the

Court acknowledges that <u>Davis</u> has often been described that way, the Court, agreeing with

Dodakian, declines to adopt such a limited interpretation. "There is nothing in <u>Davis</u>, or in any

other precedent that this Court is aware of, to suggest that [an intervening change of law] is

substantive [and thus applies retroactively] *only if* it results in a conviction for an act that the law does not make criminal." Monsanto v. United States, 143 F. Supp. 2d 273, 278 (S.D.N.Y. 2001). Rather, "the appropriate inquiry [is] whether the claimed error of law [is] a fundamental defect which inherently results in a complete miscarriage of justice, and whether [i]t . . . present[s] exceptional circumstances where the need for the remedy afforded by the writ of *habeas corpus* is apparent." Id. (alterations in original) (quoting Davis, 417 U.S. at 346 (internal quotations and citation omitted)).

Dodakian argues that United States v. Galpin, 720 F.3d 436 (2d Cir. 2013), constitutes an intervening change of law that warrants the Davis exception.[6] But Galpin did not change the applicable Fourth Amendment law. Galpin reiterated that the particularity requirement has three components, and it cited to Circuit caselaw from 1987-2012. 720 F.3d at 445-46. The court went on to recognize "a heightened sensitivity to the particularity requirement in the context of digital searches." Id. at 447. But it did not change the law on what would satisfy particularity for computer or email searches.

Moreover, the Court of Appeals in Galpin directed the district court to consider whether the fruit of the unconstitutional search warrant was saved by the good faith exception. Id. at 453. Thus, even if Galpin had changed the applicable law with regards to the particularity requirement of search warrants, Galpin would not have changed the result of Dodakian's direct appeal. The good faith exception remains good law after Galpin, and Judge Sand and the Court of Appeals both found that the good faith exception applied to the warrant here: that is, it was not unreasonable for the executing officers to rely on it. Galpin does not present a change of law that resulted in "a complete miscarriage of justice" or "exceptional circumstances." See Monsanto,

---

[6] Both parties agree that Teague v. Lane, 489 U.S. 288 (1989), is inapplicable. Gov't Br. at 21 n. 11; Pet'r Reply Br. at 6.

143 F. Supp. 2d at 278. As this claim was raised and considered on direct appeal, Dodakian may not relitigate it through her *habeas* motion.[7]

### 3.    28 U.S.C. § 2241 and Rule 60

Lastly, Dodakian argues that the Court should consider her Fourth Amendment claim under § 2241 or Rule 60(b), rather than § 2255, or alternatively, find § 2255 unconstitutional.

The savings clause of § 2255 permits a § 2241 petition if it "appears that that the remedy by [§ 2255] motion is inadequate or ineffective to test the legality of [the prisoner's] detention." 28 U.S.C. § 2255(e). A motion is "inadequate or ineffective" when "the petitioner cannot, for whatever reason, utilize § 2255, and in which the failure to allow for collateral review would raise serious constitutional questions." Triestman v. United States, 124 F.3d 361, 377 (2d Cir. 1997). The cases raising such "serious constitutional questions" have been "relatively few," id. at 378, and to date, have included only "cases involving prisoners who (1) can prove 'actual innocence on the existing record,' and (2) 'could not have effectively raised [their] claim[s] of innocence at an earlier time.'" Cephas v. Nash, 328 F.3d 98, 104 (2d Cir. 2003) (alterations in original) (quoting Triestman, 123 F.3d at 363). Here, Dodakian raised this Fourth Amendment claim on direct appeal, and its seriousness does not rise to the level of an actual innocence claim. Section 2255 review adequately and effectively tests the legality of her detention.

Rule 60(b) sets out grounds for which a court can relieve a party from a final judgment, order, or proceeding. Fed. R. Civ. P. 60(b). A Rule 60(b) motion, however, "attacks the integrity of the *habeas* proceeding and not the underlying criminal conviction." Harris v. United States, 367 F.3d 74, 77 (2d Cir. 2004). As a result, collateral attacks are "beyond the scope" of Rule 60(b). Gitten v. United States, 311 F.3d 529, 534 (2d Cir. 2002). See Gonzalez v. Crosby, 545

---

[7] Accordingly, the Court expresses no view on whether the warrant used to search Dodakian's email account in fact satisfied the particularity requirement.

U.S. 524, 531-32 (2005). Thus, Dodakian's argument that the fruit of the email search should have been suppressed involves her underlying conviction and is beyond the scope of Rule 60(b). See, e.g., Erbo v. United States, 08 Civ. 2881 (LGS), 2014 WL 6454002, at *2 (S.D.N.Y. Nov. 17, 2014) (holding that where the petitioner "asserts that a subsequent change in the law renders his conviction invalid," the "argument is beyond the scope of Rule 60(b) and can be brought, if at all, only as another *habeas* petition").

Lastly, Dodakian asks the Court, in a single sentence, to find § 2255 unconstitutional. The Court need not evaluate an argument that is so drastically underdeveloped. Moreover, the argument has no merit.

### III.    Ground Two: Gender Discriminatory Sentencing in Violation of the Equal Protection Clause of the Fourteenth Amendment

Dodakian asserts that she received a harsher sentence than her co-defendants because of implementation of the Federal Sentencing Guidelines based on gender, in violation of the Equal Protection Clause of the Fourteenth Amendment. To support her claim, she submitted a study that found that, of 29 female and 31 male prisoners convicted of federal white collar crimes with different financial loss amounts, female sentences were three times as long as male sentences, and female sentences were 155 percent of the Guideline recommendations while the male sentences were just 52 percent. Pet'r Am. Br. Ex. B (Culture QuantiX, A Comparison of White Collar Crimes Male and Female Sentences A Comparison, Sept. 16, 2013).

Because Dodakian did not address this claim on direct appeal, she ordinarily would be barred from asserting it on collateral review. See Bousley, 523 U.S. at 622. Liberally construing her pleadings, however, the Court considers this claim as one of ineffective assistance of counsel, which is an exception to the procedural default rule. See Massaro, 538 U.S. at 504. That is, the Court considers whether Dodakian's counsel was ineffective under Strickland v.

Washington, 466 U.S. 668 (1984), for failing to argue that her sentence reflects gender discrimination in violation of the Fourth Amendment. See Part IV(2) below (discussing the Strickland standard generally, and its application at sentencing). To make this determination, the Court must first reach the merits of the discrimination claim.

For sentencing purposes, courts may consider any information about a defendant's "background, character, and conduct," 18 U.S.C. § 3661, other than "invidious factors" that violate the Equal Protection Clause. United States v. Jones, 531 F.3d 163, 172 n.6 (2d Cir. 2008). "[E]qual protection principles [] apply equally to gender discrimination." J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 128 (1994). Although the Supreme Court and Court of Appeals for the Second Circuit have never held that gender discrimination in imposing a criminal sentence violates the Equal Protection Clause, it follows from the progression of equal protection caselaw that it does. Compare Batson v. Kentucky, 476 U.S. 79 (1986) (prohibiting peremptory strikes solely on the basis of race) with J.E.B., 511 U.S. at 127 (prohibiting peremptory strikes solely on the basis of gender). See United States v. Kaba, 480 F.3d 152, 156 (2d Cir. 2007) ("[A]lthough 'reference to national origin and naturalized status is permissible' during sentencing, it is allowed only 'so long as it does not become the basis for determining the sentence.'" (quoting United States v. Jacobson, 15 F.3d 19, 23 (2d Cir. 1994)). Congress also has made clear that sentencing shall be neutral with regards to gender. See 28 U.S.C. § 994(d) ("The [Sentencing] Commission shall assure that the guidelines and policy statements are entirely neutral as to the race, *sex*, national origin, creed, and socioeconomic status of offenders." (emphasis supplied)); U.S.S.G. § 5H1.10 ("[Race, *sex*, national origin, creed, religion, and socioeconomic status] are not relevant in the determination of a sentence." (emphasis supplied)). "[P]roof of actual bias [is not]

necessary to warrant vacatur of the sentence [b]ecause justice must satisfy the appearance of justice." Kaba, 480 F.3d at 156 (internal quotations and citations omitted).

Dodakian has failed to show that gender was "the basis for determining [her] sentence." Jacobson, 15 F.3d at 23 (citations omitted). None of the district judge's comments at sentencing suggests a discriminatory purpose. Cf. Kaba, 480 F.3d at 155-56, 58 (remanding for resentencing where the district judge stated that "it is entirely reasonable to assume that people from the Guinea community are going to say gee, do you hear what happened to [Kaba]? I don't want that to happen to me. I hope that has some effect here that *will deter other people from that background from doing what you've done here*" (emphasis supplied)); Leung, 40 F.3d at 585-87 (remanding for resentencing where the district judge stated that "[t]he purpose of my sentence here is to punish the defendant and to *generally deter others, particularly others in the Asiatic community* because this case received a certain amount of publicity in the Asiatic community, and I want the word to go out from this courtroom that we don't permit dealing in heroin" (emphasis supplied)).

Further, the evidence does not demonstrate that her sentencing had a discriminatory effect. She and her co-defendants were sentenced to the following:

| NAME | GENDER | COUNTS OF CONVICTION | METHOD OF CONVICTION | TERM OF IMPRISONMENT |
|---|---|---|---|---|
| David Norman | Male | Count 1 | Trial | 240 months |
| Robert Ingram | Male | Count 2 | Guilty Plea | 144 months |
| Noemie Dodakian | Female | Counts 1 & 2 | Trial | 95 months |
| Chong Shing Wu | Male | Count 2 | Trial | 85 months |
| Olivia Jeanne Bowen | Female | Counts 1 & 2 | Guilty Plea | 63 months |

Wu, the only male who received a lesser sentence than Dodakian, was convicted of only one count, compared to Dodakian's two counts. Dodakian's Pre-Sentence Report also indicates that

Wu was less culpable than Dodakian: Dodakian received over $6 million while Wu received $1.7 million, and Dodakian served as the victims' direct point of contact and handled money while "Wu typically did not solicit money directly." Dodakian Pre-Sentence Report ¶ 31, 33, 35. That Dodakian would be sentenced to more time than Wu is consistent with the Federal Sentencing Guidelines, which explicitly list the amount of financial loss incurred as a factor for a sentencing range. These facts also distinguish Dodakian's sentencing from that in Williams v. Currie, 103 F. Supp. 2d 858 (M.D.N.C. 2000), a case cited by Dodakian in support of her argument. Pet'r Am. Br. at 20. In Williams, the court granted a male petitioner *habeas* relief where two male co-defendants and one female co-defendant received minimum active sentences of 23 to 27 years, but the female's sentence was immediately suspended without any explanation, leaving her with an eight-month active sentence. Id. at 861. The court remanded the case for resentencing because the sentencing disparities were "otherwise difficult to explain as resulting from neutral factors." Id. at 864. Such disparity does not exist here, and neutral factors do.

As a result, Dodakian's counsel's decision not to bring a claim of gender discriminatory sentencing on appeal falls within the range of sound sentencing strategy and is objectively reasonable. Because Dodakian did not raise this issue on direct appeal, and her counsel was not ineffective for failing to do so, she is barred from asserting it on collateral review. See Bousley, 523 U.S. at 622. See also Part IV.

## IV. Grounds Three Through Five: Ineffective Assistance of Counsel

Dodakian argues that her counsel was ineffective pre-trial, at trial, at sentencing, and on appeal.

Defendants have a Sixth Amendment right to counsel, which includes "reasonably effective" counsel to ensure that the defendant's fundamental right to a fair trial is protected. Strickland, 466 U.S. at 684-85. To establish that counsel was ineffective, in violation of the Sixth

Amendment, a petitioner must show that (1) "counsel's representation fell below an objective standard of reasonableness," id. at 688; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

Under the first prong, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The petitioner has the burden of overcoming the presumption by proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); Strickland, 466 U.S. at 689. In considering whether counsel "failed to exercise the skills and diligence that a reasonably competent attorney would provide under similar circumstances," Boria v. Keane, 99 F.3d 492, 496 (2d Cir. 1996), the Court looks to the totality of the circumstances, must be "highly deferential," and must make "every effort . . . to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 688-89.

Under the second prong, the petitioner must demonstrate prejudice, which means showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "A reasonable probability" is defined as "a probability sufficient to undermine confidence in the outcome," id., including "the overall integrity of the proceeding." Santiago-Diaz v. United States, 299 F. Supp. 2d 293, 300 (S.D.N.Y. 2004). "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" Harrington, 562 U.S. at 104 (internal citations omitted) (quoting Strickland, 446 U.S. at 687, 693). See Carrion v. Smith, 549 F.3d 583, 588 (2d Cir. 2008).

1.      **Ground Three: Ineffective Assistance of Counsel at the Pre-trial and Trial Stage, in Violation of the Fifth and Sixth Amendments**

Dodakian argues that she was denied effective assistance of counsel due to her attorney's failure (1) pre-trial, to inform her of the existence of Alford pleas and the potential sentence exposure she faced by going to trial;[8] (2) at trial, to investigate her NASD licensing and to make meritorious objections to the government's use of the NASD licenses to impeach her at trial; and (3) at trial, to hire an independent forensic accounting expert to rebut the government's forensic accountant at trial.

A.      **Ineffective Assistance of Counsel Pre-Trial**

The Sixth Amendment right to effective assistance of counsel "extends to the plea-bargaining process." Lafler v. Cooper, 132 S. Ct. at 1384. See Boria, 99 F.3d at 498 (holding that counsel "must give the client the benefit of counsel's professional advice on th[e] crucial decision" of whether to plead guilty) (citation omitted).

Under Strickland's first reasonableness prong, counsel must communicate to the defendant the terms of a plea offer, Cullen v. United States, 194 F.3d 401, 404 (2d Cir. 1999), and "should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Purdy v. United States, 208 F.3d 41, 45 (2d Cir. 2000) (citations omitted). Counsel's advice "may take into account, among other factors, the defendant's chances of prevailing at trial, the likely disparity in sentencing after a full trial as compared to a guilty plea (whether or not accompanied by an agreement with the government), whether the defendant has maintained his innocence, and the defendant's comprehension of the various factors that will inform his plea decision." Id.

---

[8] An Alford plea reflects a defendant "voluntarily, knowingly, and understandingly consent[ing] to the imposition of a prison sentence even [though] he is unwilling or unable to admit his participation in the acts constituting the crime." North Carolina v. Alford, 400 U.S. 25, 37 (1970).

Ultimately, so long as counsel's advice falls within the range of reasonable competence under the circumstances, counsel may advise a client for or against a plea bargain, and his assistance will meet constitutional standards irrespective of whether his client agrees with his recommendation. Brown v. Doe, 2 F.3d 1236, 1246 (2d Cir. 1993) (quoting United States v. Cronic, 466 U.S. 648, 657 n.21 (1984)). See Purdy, 208 F.3d at 45 ("Counsel's [advice] . . . enjoys a wide range of reasonableness because 'representation is an art,' and 'there are countless ways to provide effective assistance in any given case." (quoting Strickland, 466 U.S. at 689, 693)).

Under Strickland's second prejudice prong, the petitioner "must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (*i.e.*, that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." Lafler, 132 S. Ct. at 1385. Courts are "skeptical of accepting a defendant's self-serving, post-conviction statements that he would have pleaded guilty if properly advised of the consequences by his attorney." Gluzman v. United States, 124 F. Supp. 2d 171, 177 (S.D.N.Y. 2000).

As to the first prong, Dodakian acknowledges that she and Mr. Stavis discussed the government's plea offer, which exposed her to "5 years plus," and Mr. Stavis's associate presented her with a proposed draft plea agreement. Pet's Br. at 22. Dodakian rejected the offer, however, because she "strongly believed [that she] did not do anything wrong." Id. Dodakian now asserts that Stavis never explained her exposure if she was convicted at trial and never mentioned the possibility of an Alford plea. Id. at 21-22. See also Pet'r Reply Br. at 8

27

("Petitioner was *never* told, nor did she ever imagine, that she could incur a higher sentence if she lost at trial, let alone what that sentence might be . . . ."). By affidavit, Mr. Stavis disagrees with this assertion, averring that he "fully explained to Petitioner all the consequences and potential sentences which could be imposed following a conviction after trial." Affidavit of Roger L. Stavis, Esq. ("Stavis Aff.") at ¶ 3. Mr. Stavis's representations were reasonable: he informed Dodakian of the plea offer and, especially in light of her maintained innocence, gave her advice on whether to plead guilty. See Missouri v. Frye, 132 S. Ct. 1399, 1408 (2012); Boria, 99 F.3d at 496-97. At the very least, Dodakian was aware that proceeding to trial could expose her to a sentence greater than that being offered in the plea.

As to the prejudice prong, Dodakian's self-serving claim that she would have pled guilty in hindsight is belied by her insistence – before trial through this § 2255 motion – that she was, and still is, innocent. Dodakian confirms that, in her conversations with Mr. Stavis regarding a plea offer, she "maintain[ed her] innocence of intentional or knowing commission of *any* crime," and Mr. Stavis advised her in return that she could not take a guilty plea if she was unable to say she was guilty of the charges against her. Pet's Br. at 22. By affidavit, Mr. Stavis affirmed this accounting: "the government's plea offer was fully considered and discussed with [Dodakian, who] . . . proclaimed her innocence and disinterest in pleading guilty because of her innocence"; in "32 years of experience," Mr. Stavis had "never encountered a circumstance where a court would accept a guilty plea from a defendant who proclaimed her innocence." Stavis Aff. at ¶ 3 (Gov't Br. Ex. E). The Court agrees: Dodakian's "persistent claims of innocence would have rendered highly problematic her ability adequately to allocute in view of the requirements of Fed. R. Crim. P. 11." Gluzman, 124 F. Supp. 2d at 177; Bicaksiz v. United States, 234 F. Supp. 2d 202, 206 (E.D.N.Y. 2002) (finding same). See also Melo v. United States, 825 F. Supp. 2d

457, 463 (S.D.N.Y. 2011) ("Insistence on innocence, although not dispositive, weighs against finding that Melo would have accepted a plea deal.").

Dodakian correctly notes that there are cases "where the disparity in potential sentences is" so great that "a finder of fact may infer" that the defendant who professes her innocence "still will consider a plea." Pet'r Reply Br. at 10 (quoting Pham v. United States, 317 F.3d 178, 183 (2d Cir. 2003)). But this is not such a case. A plea offer of "5 years plus" is not *so* different from the imposed sentence of "7 years plus" to merit such an inference. Cf. Pham, 317 F.3d at 183 (finding that the petitioner, who professed her innocence, might have considered a plea where the plea offer was 78 to 97 months compared to the "sentence after trial of 210 months, which is more than double"); United States v. Gordon, 156 F.3d 376, 381 (2d Cir. 1998) (finding that the disparity between counsel's incorrectly communicated prediction of 120 months' exposure and 262-327 months of actual exposure constituted prejudice under Strickland).

Further, Mr. Stavis acknowledges that he does "not recall discussing with Petitioner the possibility of an 'Alford plea,'" Stavis Aff. at ¶ 3, but he was under no obligation to do so. Dodakian cites Appukkutta v. Russell, in which an Alford plea was offered, for the proposition that Alford pleas were available and therefore should have been pursued by her counsel. 09 Civ. 6822 (PGG)(DF), 2013 WL 3340321 (S.D.N.Y. July 2, 2013). But the Alford plea in Appukkutta was offered in *state* court, not federal, and in any case, it involved dissimilar facts and circumstances. Dodakian simply has not demonstrated that, but for Mr. Stavis's failure to discuss every hypothetical plea with her, an Alford plea would have been offered by the prosecution, accepted by her, and accepted by the court. See Lafler, 132 S. Ct. at 1385. See also Aeid v. Bennett, 296 F.3d 58, 63 (2d Cir. 2002) (finding that although defense counsel's plea advice was undoubtedly deficient, the petitioner failed to prove that but for the deficiency the result would

have been different: *i.e.*, "(1) that the prosecutor would have offered him such a sentence and (2) that Aeid would have accepted that offer") (collecting cases). This finding is reinforced by the Department of Justice's own directives: although the Court can find no statistics on the frequency of <u>Alford</u> pleas in federal cases or within this Circuit, the Department of Justice directs its U.S. Attorneys to avoid <u>Alford</u> pleas "[d]espite the[ir] constitutional validity . . . except in the most unusual circumstances." United States Attorneys' Manual § 9-27.440(B) (describing such pleas as "particularly undesirable" and directing government attorneys to "discourage <u>Alford</u> pleas").

## B.    Ineffective Assistance of Counsel at Trial

When asserting an ineffective assistance of trial counsel claim, the petitioner "must overcome the 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" <u>Bell v. Cone</u>, 535 U.S. 685, 698 (2002) (quoting <u>Strickland</u>, 466 U.S. at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955))). Because "the best criminal defense attorneys would not defend a particular client in the same way," <u>Strickland</u>, 466 U.S. at 689, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." <u>Id.</u> at 686.

### i.    Failure to Investigate

"What investigation decisions are reasonable depends critically" on the "information supplied by the defendant." <u>Strickland</u>, 466 U.S. at 691. And, in some cases, it is reasonable for counsel to determine that based on the information supplied by her client, independent investigation is unnecessary.

Dodakian alleges that Mr. Stavis was ineffective at trial for failing to investigate her professional history more thoroughly. She believes that investigation would have led him to

discover that she had some NASD licenses but not others, which presumably would have

changed their defense strategy. Specifically, she states that she and her sister told Mr. Stavis that

she sold insurance in the past, so Mr. Stavis should have investigated whether she had any

relevant insurance licenses.

But counsel need not "investigate comprehensively every lead or possible defense, or '[]

scour the globe on the off-chance something will turn up.'" Greiner v. Wells, 417 F.3d 305, 321

(2d Cir. 2005) (internal citations omitted) (quoting Rompilla v. Beard, 545 U.S. 374, 383

(2005)). "[R]easonably diligent counsel may draw a line when they have good reason to think

further investigation would be a waste." Rompilla, 545 U.S. at 383. See also Henry v. Poole, 409

F.3d 48, 63 (2d Cir. 2005) ("[S]trategic choices made after less than complete investigation do

not amount to ineffective assistance – so long as the known facts made it reasonable to believe

that further investigation was unnecessary." (citation omitted)). In his affidavit, Mr. Stavis avers:

> While I routinely employ investigators to uncover facts and
> witnesses regarding the circumstances of an offense, I have never
> employed an investigator to assess the truth and veracity of what a
> client tells me about her personal background. . . . I repeatedly
> pressed the Petitioner about her work history and background as
> well as her knowledge and sophistication with regard to
> investments. At no time did she reveal the fact that she studied for,
> took and passed an examination for a securities license. . . . Her
> deception allowed me to adopt a trial defense that as an individual
> who knew nothing about investments, she believed that those she
> promoted were legitimate.

Stavis Aff. ¶ 4. Whether Dodakian simply forgot that she had passed the NASD licensing exams

or chose not to tell Mr. Stavis about them, Mr. Stavis's reliance on the information Dodakian

herself provided is objectively reasonable. See Lopez v. Brown, No. 08 CIV. 3495 (JGK), 2009

WL 1492208, at *5 (S.D.N.Y. May 28, 2009) (finding counsel's "decision to rely on the

petitioner's version of the facts [] not objectively unreasonable").

This is not a case in which counsel was ineffective for his "complete failure to investigate the facts" at the heart of the case or for pursuing an irrelevant defense strategy. Lopez, 2009 WL 1492208, at *6. See Greiner, 417 F.3d at 322, 325 ("In nearly every case that concludes that counsel conducted a constitutionally deficient investigation, the courts point to readily available evidence neglected by counsel.") (collecting cases). Cf. Thomas v. Kuhlman, 255 F. Supp. 2d 99, 109 (E.D.N.Y. 2003) (finding counsel ineffective where, had he investigated, he would have "eliminated all proof that defendant was seen that evening outside of the victim's window," been able to attack the credibility of the prosecution's lead witness, been able to "highlight the implausibility of the prosecution's theory of the crime," and "been able to deal significant blows to the prosecution's case in several ways"). To the extent there was any failure, it was failing to investigate the veracity of Dodakian's own, reasonable statements to her lawyer. Counsel cannot be deemed ineffective for that. Indeed, Mr. Stavis's defense strategy was reasonably based on Dodakian's insistence that she was inexperienced with investments and believed the financial schemes she endorsed were legitimate. Had Dodakian insinuated that there were tests she may have taken or licenses she may have received, and then Mr. Stavis failed to follow-up on her lead, her claim might be different. But that is not the case.

Further, Dodakian is incorrect in her assertions that the government impeached her with false evidence, *i.e.*, with evidence that she had passed a supervisory NASD exam. Pet'r Am. Br. at 24. The government only asked her whether she "*took* an exam to become a supervisor of people who sell mutual funds." Tr. 1025:24-25 (emphasis supplied). She responded that she did not "remember the supervisor part," (Tr. 1026:22-23), and after pointing her to a portion of the exam, the government asked whether the document "refresh[ed] her recollection that [she] took an exam to become a supervisor of people who sell mutual funds?" Tr. 1027:6-7. When

Dodakian again said, "no," explaining that she did not see where the exam indicated anything about "supervisor," the government moved on. Tr. 1027:8. In her *habeas* petition, Dodakian clarifies that she *did* take the supervisor exam, only she failed it. The cross-examination may have led the jury to believe she had passed the supervisory exam, but that is not due to any wrongdoing on the part of the government. This colloquy in and of itself does not undermine the reliability of the jury's findings.

Undoubtedly, had Mr. Stavis known of the NASD licenses, including the supervisory license she did not have because she failed the relevant exam, he could have attempted to use them in a way that rehabilitated Dodakian. But there is no reasonable probability that had he been able to do so, the outcome at trial would have been different. Contrary to Dodakian's assertions, the licenses, and her having forgotten about them, were only *one* piece of the impeachment evidence used to attack her credibility. The government also impeached Dodakian by eliciting that she had previously worked selling financial products, with a 2007 job application in which she portrayed herself as an experienced entrepreneur, earlier tax returns where she labeled herself a "consultant" and later tax returns, filed directly before trial, where she labeled herself a "housewife," and evidence that she had personally maintained dozens of bank accounts in the names of multiple LLCs through which she routed millions of dollars. By testifying that she was "not a financial person," Dodakian opened the door to this impeachment on cross-examination such that there is no reasonable probability of a different outcome had the impeachment evidence included everything but the licenses. Even errors that "conceivably could have influenced the outcome" do not necessarily "undermine[] the reliability of the result of the proceeding." Strickland, 466 U.S. at 693.

>           ii.        **Failure to Object**

Dodakian next argues that although Mr. Stavis objected to the introduction of the NASD licenses, he should have done so on different grounds. She asserts that he should have objected because the NASD licenses were not produced to her before trial, and the failure to produce the records violates Federal Rule of Criminal Procedure 16(a)(1)(B)(i). Pet'r Am. Br. at 26.

"The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (holding that there is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect"). Objections are made quickly and during the heat of trial. "[D]ecisions such as when to object and on what grounds are primarily matters of trial strategy and tactics, and thus are virtually unchallengeable." United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotations and citations omitted). Over the course of the trial, Mr. Stavis revealed himself to be able and attentive counsel who objected appropriately within the range of reasonable professional assistance. Even if the grounds he objected on were later deemed to have no merit, Pet'r Am. Br. at 27 (citing Ingram, 490 F. App'x at 366), and even if his objection *might* have been successful if he had made it on other grounds, this one unsuccessful objection did not prejudice Dodakian given the weight of the totality of the evidence.

Further, Rule 16(a)(1)(B), cited by Dodakian, refers to "statements" made by the defendant, which an exam, application, or license is not. Cf. Pet'r Reply Br. at 21 (citing United States v. Douglas, 336 F. App'x 11, 13 (2009) (Rule 16 requires the government to disclose the tape of the defendant's telephone conversation with his mother); United States v. Thomas, 239 F.3d 163, 166 (2d Cir. 2001) (Rule 16 requires the government to disclose written transcript of statements defendant made at administrative hearing describing "the events leading up to his

34

arrest"); <u>United States v. Matthews</u>, 20 F.3d 538 (2d Cir. 1994) (Rule 16 requires the

government to disclose a letter written by the defendant to its star witness); <u>United States v.</u>

<u>Stevens</u>, 985 F.2d 1175 (2d Cir. 1993) (Rule 16 requires the government to disclose a copy of the

tape recording of the defendant's conversation with a government witness)). Thus, Mr. Stavis's

failure to object on these grounds was objectively reasonable.

 Reading Dodakian's petition liberally, Rule 16(a)(1)(E), by contrast, covers documents

and objects, a copy of which must be given to the defendant, *upon her request*, where "(i) the

item is material to preparing the defense; (ii) the government intends to use the item in its case-

in-chief at trial; or (iii) the item was obtained from or belongs to the defendant." Fed. R. Crim. P.

16(a)(1)(E). <u>See</u> Pet'r Reply Br. at 21 (citing <u>United States v. Holihan</u>, 236 F. Supp. 2d 255, 258

(W.D.N.Y. 2002) (Rule 16 required the government to disclose, at the petitioner's request,

suspicious activity reports that were material, and had more than an abstract relationship to, the

defense). Dodakian argues that "the government never hinted of the existence of these

documents." Pet'r Reply Br. at 23. But the NASD licenses "were at all times . . . as available to

[her] as they were to the Government." <u>United States v. Gleason</u>, 616 F.2d 2, 25 (2d Cir. 1980).

Furthermore, the NASD licenses were not relevant to the Government's case in chief and

became relevant "for impeachment purposes *only after* [the defendant] testified on direct." <u>Id.</u> at

24 (emphasis supplied). The government's failure to provide Dodakian with copies of her own

NASD licenses did not prevent her "from preparing to meet the charges against" her, <u>id.</u> at 25,

and would not "have enabled the defendant significantly to alter the quantum of proof in [her]

favor." <u>United States v. Maniktala</u>, 934 F.2d 25, 28 (2d Cir. 1991) (quoting <u>United States v.</u>

<u>Ross</u>, 511 F.2d 757, 762-63 (5th Cir. 1975)). Moreover, a document is not "material [under Rule

16] merely because it would have dissuaded the defendant from proffering easily impeached testimony." United States v. Stevens, 985 F.2d 1175, 1180 (2d Cir. 1993).

### iii.    Failure to Hire a Rebuttal Expert

Dodakian next alleges that Mr. Stavis was ineffective at trial for failing to hire an independent forensic accounting expert to rebut the government's forensic accountant.

Dodakian states that she has records that "absolutely show that [she] never took or kept a penny for [her]self. They also prove that the amount of money that [she] ever had anything to do with was roughly $3.5 million, not $6 million, as the government said." Pet'r Am. Br. at 27. She argues that she gave the records proving as much to Mr. Stavis but he "refused to use them." Id. She argues that although the government introduced at trial an email from Bowen to her indicating that Bowen was going to wire her $30,000, she never received that money; but the jury believed that she did, which had a "devastating impact" on her case. Id. at 25.

At trial, the government's forensic accountant scoured bank documents from Dodakian's 13 bank accounts, as well as tax returns, which showed that between 2003 and 2008, the accounts received over $4.6 million, commingled with the Dodakians' personal funds, from the two schemes. From those bank accounts, $604,000 was withdrawn, mostly through checks written to "cash" or "self," and $532,000 was spent on personal family purchases. During the same time period, the Dodakians' tax returns reflect that the Dodakians never reported more than $37,908 to $98,750 of income per year.

By affidavit, Mr. Stavis explains that he "spen[t] time and energy with" her financial records, which "did not, as Petitioner now claims, prove that Petitioner failed to personally profit from the 'advance fees' she obtained from her victims." Stavis Aff. ¶ 5. To the contrary, "the records and evidence at trial proved overwhelmingly" that she had profited. Id. "For that reason, [Mr. Stavis] chose to focus [their] efforts on the cross-examination of the Government's forensic

accountant" rather than hire an independent account. Id. Further, even if Dodakian were correct, "the fact that she did not retain funds and instead passed them on to co-conspirators, was not a legal defense to the charges." Id.

So long as counsel's decision not to call a witness or hire an expert is "grounded in some strategy that advances the client's interests," Eze v. Senkowski, 321 F.3d 110, 129 (2d Cir. 2003), the decision generally falls "within the range of acceptable strategic and tactical alternatives" that courts are loathe to disturb. United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998). Further, as was the case here, when there is "reason to believe that pursuing certain [strategies] would be fruitless *or even harmful*, counsel's failure to pursue those [strategies] may not later be challenged as unreasonable." Strickland, 466 U.S. at 691 (emphasis supplied). Given the evidence introduced at trial, Dodakian has not overcome the strong presumption that Mr. Stavis's decision to forego an independent account was a reasonable and sound strategy. See Strickland, 466 U.S. at 689, 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.").

## 2.   Ground Four: Ineffective Assistance of Counsel at Sentencing, in Violation of the Fifth and Sixth Amendments

Ineffective assistance of counsel extends to sentencing hearings because "any amount of [additional] jail time has Sixth Amendment significance." Lafler, 132 S. Ct. at 1386 (alteration in original) (quoting Glover v. United States, 531 U.S. 198, 203-04 (2001)). Dodakian claims that her counsel was ineffective at sentencing for (1) suggesting, in the Pre-Sentence Memo, that she was guilty when she "steadfastly maintain[ed] her innocence despite a conviction," and (2) failing to address the § 3553(a) sentencing factors. Pet'r Am. Br. at 35.

## A.    Failure to Heed Defendant's Request

The Pre-Sentence Memo included the sentence: "there is no denying that [Dodakian] has strayed from the path, and committed the crimes for which she must now be punished." Pet'r Am. Br. at 34. Dodakian argues that she "strongly object[ed]" to any language proclaiming her guilt, yet her counsel would not remove the language. Pet'r Reply Br. at 35. By affidavit, Mr. Stavis explains that after Dodakian:

> was convicted by the jury . . . [m]y goal in sentencing was to achieve the lowest sentence possible, *without in any way undermining our arguments or claims on appeal.* To do this, I believed as a matter of strategy that as her counsel, I had to make the statements I made at sentencing. I believed then and still do that a lack of remorse and insight demonstrated by a proclamation of innocence at sentencing would have invariably led to a much longer sentence.

Stavis Aff. ¶ 6 (emphasis supplied). Mr. Stavis's affidavit is corroborated by a contemporaneous letter he sent to Dodakian leading up to the sentencing hearing in which he wrote:

> I wanted to write to you about our *difference in strategy* with regard to your sentencing next week. We have had numerous discussions about it by email and when I visited with you at MDC on February 23rd. It is a fact that a jury has convicted you of a crime. . . . This is a fact regardless of your actual guilt or innocence. It is a fact that must be taken into consideration at your sentencing. Our goal at sentencing is [to] get the best possible sentence for you. Your sentencing is not the appropriate forum for you to proclaim your innocence. That is for a second trial should we win your appeal. To do so at sentencing will only harm your chances of a lesser sentence. The judge . . . would appreciate some recognition of your remorse. *By having your attorneys attempt to do this YOU are not admitting your guilt and you are not harming any changes for appeal or for an acquittal at a second trial*. You are only enhancing the possibility of a favorable sentence. . . . [I]f you wish I can ask the court to be relieved as your attorney. . . . [A]n attorney can be appointed to represent you free of charge. *That attorney may or may not agree with your strategy for sentencing*. . . .

Pet'r Am. Br. Ex. G (Stavis Letter, dated March 10, 2011) (emphasis supplied).

Although "[a]n attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy. . . [t]hat obligation[] does not require counsel to obtain the defendant's consent to 'every tactical decision.'" Florida v. Nixon, 543 U.S. 175, 187 (2004) (quoting Strickland, 466 U.S. at 688; Taylor v. Illinois, 484 U.S. 400, 417-18 (1988)). Mr. Stavis's experience and analysis of the case led him to conclude that acceptance of responsibility, "without in any way undermining our arguments or claims on appeal," would promote sentence reduction. Stavis Aff. ¶ 6. That was a tactical choice that belongs to counsel, not Dodakian. See Model Rules of Professional Conduct R. 1.2 (noting that "[i]n a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer," only "as to a *plea* to be entered, *whether to waive jury trial* and *whether the client will testify*." (emphasis supplied)). Further, Mr. Stavis's decision was not only reasonable, but also beneficial to Dodakian: he successfully argued against the obstruction of justice sentencing enhancement – an enhancement that "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." Commentary to United States Sentencing Commission Guidelines Manual § 3E1.1. See Rodriguez-Quezada v. United States, 08 Civ. 5290 (SHS), 06 Cr. 188, 2008 WL 4302518, at *3 (S.D.N.Y. Sept. 15, 2008). That is, had Mr. Stavis not indicated that Dodakian in some way accepted responsibility, the Court very well may have imposed that enhancement. Moreover, even if Mr. Stavis should have deferred to his client's insistence on wording in the sentencing memorandum, which he was *not* obligated to do, his error has not caused prejudice. Contrary to Dodakian's argument, showing remorse at sentencing did not "destroy[ her] ability to assert actual innocence on appeal." Pet'r Rep. Br. at 32.

### B.     Failure to Consider Section 3553 Sentencing Factors

Dodakian next argues that her counsel's failure to address the appropriate § 3553 sentencing factors constitutes ineffective assistance. This assertion is factually incorrect. Mr.

Stavis requested a below-guidelines sentence pursuant to the § 3553 factors, and then referenced numerous equities – mainly Dodakian's ties to family and the community, as well as her subsequent activities in prison – pursuant to the § 3553 "history and characteristics of the offender" factor. S. Tr. 3:19-21, 4:10-15, 5:24-5:2, 10-11. Although Dodakian objects that Mr. Stavis submitted a pre-sentencing memorandum that "was solely devoted to drawing the judge's attention to [her] personal history and characteristics," that is precisely what a pre-sentencing memorandum is meant to do. Pet'r Am. Br. at 34. Pre-sentencing memoranda give defendants an opportunity to set out their individual history and characteristics so that they may be weighed against the seriousness of the offense for which they were convicted, and the need for deterrence, punishment, and rehabilitation.

Dodakian also argues that Mr. Stavis failed to argue "the inherent unreasonableness of the guidelines on loss amount." Pet'r Am. Br. at 35. But Mr. Stavis specifically referenced Dodakian's co-defendant Bowen's sentence in arguing that Dodakian was less culpable, and thus should get less time than, Bowen, which would be far less than the upper range of the Guidelines. That Mr. Stavis did not explicitly argue "the inherent unreasonableness" of the Guidelines is not objectively unreasonable when he might have believed doing so would be futile: the Guidelines are used as a reference by all federal judges, every day, in this country.

### C. Failure to Consider Section 3553 Sentencing Factors and Sentencing Disparity

Lastly, although not a claim for ineffective assistance of counsel, Dodakian argues that the district judge failed in his duties to consider the § 3553 factors and imposed a constitutionally unreasonable sentence – an argument that the Court construes as inextricably tied to her claim that Mr. Stavis unreasonably failed to mention that the Guidelines "would result in a shocking sentencing disparity between [Dodakian] and other defendants." Pet'r Am. Br. at 35.

"The district court should ordinarily 'begin all sentencing proceedings by correctly calculating the applicable Guidelines range,' and then consider the factors listed in 18 U.S.C. § 3553(a)." United States v. Preacely, 628 F.3d 72, 79 (2d Cir. 2010) (quoting Gall v. United States, 552 U.S. 38, 49 (2007)). "Where the judge imposes a sentence outside the Guidelines, the judge will explain why he has done so." Rita v. United States, 551 U.S. 338, 357 (2007). The sentencing "judge must explain enough about the sentence for a reviewing court both to understand it and to assure itself that the judge considered the principles enunciated in federal statutes and the Guidelines." United States v. Corsey, 723 F.3d 366, 374 (2d Cir. 2013) (citing Rita, 551 U.S. at 357). "[I]n the absence of record evidence suggesting otherwise," however, the Court "presume[s] that a sentencing judge has faithfully discharged her duty to consider the statutory factors." United States v. Verkhoglyad, 516 F.3d 122, 129, 131 (2d Cir. 2008) (internal quotations and citation omitted). And even a brief explanation by the sentencing judge, albeit not ideal, may suffice. See, e.g., Rita, 551 U.S. at 359 ("We acknowledge that the judge might have said more. He might have added explicitly that he had heard and considered the evidence and argument . . . [but where] the record makes clear that the sentencing judge considered the evidence and arguments, we do not believe the law requires the judge to [elaborate] more extensively."). See also United States v. Fleming, 397 F.3d 95, 100 (2d Cir. 2005) ("[N]o specific verbal formulations should be prescribed to demonstrate the adequate discharge of the duty to 'consider' matters relevant to sentencing.").

Here, Judge Sand first heard the parties on the Guidelines range, which was determined to be 87 to 108 months. S. Tr. 3:4-11. He then listened to, and often responded to, each argument made before him. He declined to impose the perjury sentence enhancement and did not impose a sentence near the top of the Guidelines' range or deviate above the range. From this, the Court

infers that Judge Sand's consideration of the § 3553(a) factors led him to conclude that a top of the Guidelines or above-the-Guidelines sentence was not warranted. In issuing Dodakian's sentence, Judge Sand spoke about "the number of victims" affected by the schemes, that Dodakian lied to those victims, and that she "wrecked the lives of many." S. Tr. 16:3-8. He described her as "hypocritical." S. Tr. 16:4. Although Judge Sand could "have said more," "[h]e must have believed that there was not much more to say." Rita, 551 U.S. at 358-59. The Court "will not conclude that a district judge shirked [his] obligation to consider the § 3553(a) factors simply because [he] did not discuss each one individually or did not expressly parse or address every argument relating to those factors that the defendant advanced." United States v. Fernandez, 443 F.3d 19, 30 (2d Cir. 2006), abrogated on other grounds by Rita, 551 U.S. 338. Judge Sand's decision was "within the range of permissible decisions," and the Court finds no basis for determining that the prison term imposed is unreasonable. United States v. Cavera, 550 F.3d 180, 191 (2d Cir. 2008).

Section 3553(a)(6) also requires sentencing judges to take into account "unwarranted sentence disparities among defendants with *similar* records who have been found guilty of *similar* conduct." 18 U.S.C. § 3553(a)(6) (emphasis supplied). The Court of Appeals for the Second Circuit has interpreted this to apply to "nationwide sentence disparities," but not "disparities between co-defendants," especially where the co-defendants are not similarly situated.[9] United States v. Frias, 521 F.3d 229, 236 (2d Cir. 2008). Further, the Court of Appeals has recognized:

---

[9] This, in part, explains some of the sentencing disparity among Dodakian and her co-defendants. Dodakian's co-defendant Bowen was not similarly situated, not least because Bowen pled guilty while Dodakian proceeded to trial. See, e.g., United States v. Medina, 607 F. App'x 60, 62 (2d Cir. 2015) ("Unlike his co-defendants, Jones elected to contest his guilt and go to trial rather than plead guilty and accept responsibility, a distinction we have recognized as supporting a disparity in sentences.") (collecting cases); United States v. Burris, 565 F. App'x 21, 22 (2d Cir. 2014) ("While [the] co-

> It is not entirely clear what it means for a district judge to consider the effects of an individual defendant's sentence on nationwide disparities [pursuant to § 3553(a)(6)'s mandate]. On the one hand . . . it must require something different than mere consideration of the Guidelines . . . . On the other hand, it cannot be that a judge must act as a social scientist and assess nationwide trends in sentencing with each new defendant . . . ."

United States v. Wills, 476 F.3d 103, 110 (2d Cir. 2007), abrogated on other grounds by

Kimbrough v. United States, 552 U.S. 85, 108-09 (2007), as recognized in Cavera, 550 F.3d at

191. See also United States v. Parris, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008). As a result, the

"mandate to take into account nationwide disparities under § 3553(a)(6) . . . is modest" and

judges need only "be mindful of the general goal, however elusive, of national consistency."

Wills, 476 F.3d at 110.

In support of her argument that her sentence is substantively unreasonable and Mr. Stavis

was ineffective, Dodakian compares herself to twelve other defendants and the sentences they

received for their fraud convictions. Pet'r Am. Br. at 39-43. The courts, however, have "rarely

held that a sentence is substantively unreasonable." Corsey, 723 F.3d at 378. And the defendants

that Dodakian listed are *not* similarly situated. Five of the defendants listed by Dodakian pled

guilty and did not proceed to trial. All of them were convicted of crimes related to securities

fraud, for deceiving and depriving investors of millions of dollars. See id. And unlike

Dodakian's crime, securities fraud often involves "faceless stockholders" who are "strangers" to

the fraud's perpetrators. United States v. Regensberg, 635 F. Supp. 2d 306, 313 (S.D.N.Y. 2009)

(distinguishing United States v. Adelson, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), in which the

Court departed downward from the Guidelines where the defendant partook in the fraud only "at

---

defendants [], like Burris, held leadership positions in the scheme, they were not similarly situated in that they pleaded guilty at an earlier juncture, receiving three-level Guideline reductions for acceptance of responsibility . . . .").

the tail end of an ongoing conspiracy" and the victims were "strangers" and "faceless stockholders"). By contrast, Dodakian spoke on the phone often with her victims, they came to trust and rely on her, and these victims suffered actual losses – money which Dodakian and her co-defendant benefited from. Cf. Corsey, 723 F.3d at 379 (finding that sentencing judge erred by not discounting the Guideline's calculation where the "conspiracy to defraud involved no actual loss, no probable loss, and no victim"). Thus, the loss amounts endured by strangers and caused by those convicted of securities fraud are not directly comparable to the losses endured by named individuals, who had personal relationships with Dodakian and her co-defendants.

Further, Judge Sand was not beholden to find similarly situated defendants before sentencing Dodakian, nor was Mr. Stavis's failure to raise this argument objectively unreasonable. Dodakian's sentence was well within the guidelines. In one of the few opinions to extensively address the court's duty related to sentencing disparity, District Judge Frederic Block "asked counsel to search for nationwide similarities in securities-fraud cases." 573 F. Supp. 2d at 752. Judge Block found that the data showed "marked dissimilarities from case to case, causing [the court] to surmise that it was realistically impossible to line up similarly situated defendants on a national scale." Id. (internal quotations and citation omitted). The Court finds it unnecessary to require such a searching review here. The sentence is "located within the range of permissible decisions." Preacely, 628 F.3d at 79. And "mindful of the general goal, however elusive, of national consistency," Wills, 476 F.3d at 110, the Court is satisfied that Dodakian's sentence has not "run amok" such that the Guidelines become "patently absurd on their face." Parris, 573 F. Supp. 2d at 745 (quoting Adelson, 441 F. Supp. 2d at 514). For these reasons, it was not objectively unreasonable for Mr. Stavis to not explicitly reference national consistency and

disparities, and there is no reasonable probability that Dodakian's sentence would have been different but for his failure to raise this issue.

### 3.      Ground Five: Ineffective Assistance of Counsel on Appeal

The Sixth Amendment right to effective assistance of counsel applies on appeal, as well, "so that a petitioner who alleges ineffective assistance of appellate counsel must demonstrate that appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and absent counsel's deficient performance, there was a reasonable probability that petitioner's appeal would have been successful." Anderson v. Keane, 283 F. Supp. 2d 936, 941 (S.D.N.Y. 2003) (citing Smith v. Robbins, 528 U.S. 259, 285 (2000)). A petitioner may show ineffective assistance where "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994). Appellate counsel need not raise every claim, however, "but rather may select from among them in order to maximize the likelihood of success on appeal." Smith, 528 U.S. at 288.

 Dodakian claims that her counsel was ineffective on appeal for "not assail[ing] his own performance during the" pre-trial, trial, and sentencing stages, in violation of her Fifth and Sixth Amendments. First, as discussed above, Mr. Stavis was not ineffective at the pre-trial, trial, or sentencing stages. Second, because an attorney who represents a defendant at trial and on appeal is unlikely to raise an ineffective assistance claim against himself, an ineffective assistance of counsel claim is often most appropriately brought in a collateral proceeding under § 2255, rather than on direct appeal. Massaro, 538 U.S. at 504-05. Therefore, Mr. Stavis's failure to raise a claim of his own ineffective assistance is not objectively unreasonable. Further, the arguments that Mr. Stavis did make on appeal were objectively reasonable: he argued that the district court erred in denying Dodakian's motion to suppress emails and by allowing the government to use

Dodakian's NASD license application at trial. That Mr. Stavis chose these two key issues in order to maximize the likelihood of success on appeal is not unreasonable. Nor has Dodakian been prejudiced by his decision to raise those, as opposed to other, claims.

## V.   Ground Six: Prosecutorial Misconduct

Dodakian's last claim is that prosecutorial misconduct before and at trial violated her constitutional rights. Specifically, she asserts that the government (1) suppressed evidence, in violation of Brady v. Maryland, 373 U.S. 83 (1963), indicating that she had passed two low level NASD exams and a NASD supervisor exam, and (2) violated her Fifth and Sixth Amendment rights to a fair trial by mischaracterizing the Series 63 exam as a supervisor's exam.

Because Dodakian did not address this claim on direct appeal, she ordinarily would be barred from asserting it on collateral review. See Bousley, 523 U.S. at 622. Liberally construing her pleadings, however, the Court considers this claim as one of ineffective assistance of counsel, which is an exception to the procedural default rule. See Massaro, 538 U.S. at 504. That is, the Court considers whether Dodakian's counsel was ineffective under Strickland for failing to argue prosecutorial misconduct. To make this determination, the Court must first reach the merits of the discrimination claim.

Under Brady v. Maryland, the government violates due process where it (1) failed to disclose evidence in its possession, whether in bad faith or inadvertently, (2) the undisclosed evidence was favorable to the accused because it is exculpatory or could have been used for impeachment, and (3) there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. 373 U.S. at 87. See Strickler v. Greene, 527 U.S. 263, 280-81 (1999); Kyles v. Whitley, 514 U.S. 419, 433-34 (1995); United States v. Bagley, 473 U.S. 667, 676 (1985); United States v. Agurs, 427 U.S. 97, 107 (1976);

46

Giglio v. United States, 405 U.S. 150, 154 (1972). "Nonetheless, evidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." United States v. Payne, 63 F.3d 1200, 1208 (2d Cir. 1995) (internal quotations and citations omitted) (alteration in original). Here, although the government failed to disclose evidence in its possession which was favorable to Dodakian, Dodakian knew of, and had equal access to, the same NASD applications and exams that the government used against her at trial. Moreover, for the reasons stated above, there is no reasonable probability that the result of the proceeding would have been different had Dodakian's counsel had the NASD licenses beforehand. See Part IV(1)(B)(ii).

Dodakian also argues that, if not a violation pursuant to Brady, the government's question suggested that Dodakian had passed a NASD supervisory exam and thus constituted prosecutorial misconduct. "In determining whether the government's [alleged] misconduct so substantially prejudiced [the defendant] as to deprive him of a fair trial, [courts] consider '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the certainty of conviction absent the misconduct.'" United States v. Truman, 688 F.3d 129, 144 (2d Cir. 2012) (quoting United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002)). When the government asked Dodakian whether she "took an exam to become a supervisor of people who sell mutual funds," Dodakian never answered affirmatively, and the government eventually went on to other questioning. The jury very well may have assumed that the answer was yes, that she had taken the exam, and wrongly, that she also had passed the exam. But such an assumption does not constitute misconduct on the government's behalf where the government stayed within the confines of cross-examination and zealous advocacy. Further, the questions certainly did not

substantially prejudice Dodakian. There is no reasonable probability that Dodakian would not have been convicted had the government not asked about the supervisory exam. Dodakian's counsel was not ineffective for failing to make these arguments.

## VI. Hearing

Section 2255 requires the district court to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). See Gonzalez v. United States, 722 F.3d 118, 130 (2d Cir. 2013); Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001).

"The procedure for determining whether a hearing is necessary is in part analogous to . . . a summary judgment proceeding. . . . If material facts are in dispute, a hearing should usually be held, and relevant findings of facts made." Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009). The Court should also grant a hearing if the petitioner may be able to meet her burden of establishing a *prima facie* case for relief at the hearing. See id. This includes when a petitioner "has made a 'plausible claim' of ineffective assistance of counsel." Morales v. United States, 635 F.3d 39, 45 (2d Cir. 2011) (quoting Puglisi, 586 F.3d at 213). To make this determination, the Court must consider the petitioner's motion setting forth her legal and factual claims, along with relevant exhibits, the opposing party's motion, and the record from the underlying criminal proceeding. The Court must view the credible evidentiary proffers and record in the light most favorable to the petitioner.

Where allegations are "vague, conclusory, or palpably incredible," however, a hearing is unnecessary. Machibroda v. United States, 368 U.S. 487, 495 (1962). The Court "need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214. And where testimony of the

petitioner and trial counsel "would add little or nothing to the written submissions," it is within the district court's discretion to forego a hearing, choosing "a middle road that avoid[s] the delay, the needless expenditure of judicial resources, the burden on trial counsel and the government, and perhaps the encouragement of other prisoners to make similar baseless claims that would have resulted from a full testimonial hearing." Chang, 250 F.3d at 86. See also Raysor v. United States, 647 F.3d 491, 494 (2d Cir. 2011) ("A full-fledged evidentiary hearing [is] unnecessary to flesh out the petitioner's § 2255 petition."); Pham, 317 F.3d at 184 (noting that while "[o]ur precedent disapproves of summary dismissal of petitions where factual issues exist[] . . . it permits a 'middle road' of deciding disputed facts on the basis of written submissions" (quoting Chang, 250 F.3d at 86)).

In Chang, for example, the district court did not hold a hearing but considered the petitioner's affidavit's conclusory allegations along with the counsel's "detailed affidavit" "credibly describing" that petitioner was advised of his right to testify, detailing conversations between counsel and the petitioner on whether to testify, and explaining why counsel thought it was inadvisable for the petitioner to testify. 250 F.3d at 85. The Court of Appeals for the Second Circuit affirmed the district court's decision to forego the hearing because counsel's affidavit "belied [the petitioner's] claim." Id. at 82 (citation omitted). In Puglisi, the district court denied a hearing because the petitioner "had persisted in his claims of innocence" and "exhibited no intent to accept any offered plea agreement." 586 F.3d at 212. The Court of Appeals affirmed, explaining that "a petitioner seeking a hearing must proffer arguably credible evidence of a *prima facie* case that, but for counsel's improper advice, the petitioner would have accepted the plea offer." Id. at 215. There, the petitioner's proffers were not "credible in light of all the relevant circumstances," id., and the petitioner had not proffered "objective evidence that he

would have accepted the plea," id. at 217, such as "a significant disparity between the terms of a plea offer and his ultimate sentence exposure after a trial conviction." Id.

"While improbable," Dodakian's claims standing alone are "not so clearly bereft of merit as to be subject to dismissal on [their] face." Chang, 250 F.3d at 85. But the Court has considered the affidavit of Dodakian's trial counsel, along with Dodakian's lengthy petition and reply brief, the exhibits she submitted, the government's brief, and the underlying record. See id. at 86 ("[A] court may use methods under Section 2255 to expand the record without conducting a full-blown testimonial hearing."). Trial counsel's affidavit, along with record of the underlying criminal proceedings, contradict Dodakian's assertions and persuade the Court that she has not made a plausible case for ineffective assistance of counsel nor is she entitled to any other relief. There are no genuine issues of material fact, and a hearing "would add little or nothing to the written submissions." Id. Accordingly, the request for a hearing is denied.

## CONCLUSION

For the aforementioned reasons, I recommend that Dodakian's petition and request for a hearing be DENIED. I further recommend that the Court certify, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from its order would not be taken in good faith and, therefore, that *in forma pauperis* status be denied for the purpose of an appeal. See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

*      *      *

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules

of Civil Procedure. See also Fed. R. Civ .P. 6(a), (d) (adding three additional days when service

is made under Fed. R. Civ. P. 5(b)(2) (C), (D), (E), or (F)). A party may respond to another

party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2).

Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the

chambers of the Honorable Alison J. Nathan at the Thurgood Marshall United States Courthouse,

40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. §

636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing

objections must be addressed to Judge Nathan. The failure to file these timely objections will

result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R.

Civ. P. 6(a), 6(b), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge


DATED:   New York, New York
         August 14, 2015



cc:      Noemi Dodakian (*By Chambers*)
         61267-054
         Federal Prison Camp
         Rt 37
         Danbury, CT 06811